Present: Hassell, C.J., Koontz, Kinser, Lemons, Goodwyn and
Millette, JJ., and Russell, S.J.

TERRY LYNN SULLIVAN                          OPINION BY
                                   SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 100431                    November 4, 2010

COMMONWEALTH OF VIRGINIA

              FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal from a conviction of misdemeanor animal

cruelty under former Code § 3.1-796.122,[1] the sole question is

whether the evidence was sufficient to support the conviction.

                        Facts and Proceedings

     In accordance with familiar principles of appellate

review, the evidence will be stated in the light most

favorable to the Commonwealth, the prevailing party at trial.

     While Brigette Berbes was driving on Interstate 81 in

Augusta County about noon on April 10, 2008, she observed a

horse lying in a pasture near the highway.  The horse was

covered with a purple blanket.  Ms. Berbes, who was

experienced in the care of horses, thought the blanket unusual

because the temperature was in the upper 70's at the time.

She ran some errands and then drove back by the same route.

The horse was still lying in the same place.

_____

     [1] Former Code § 3.1-796.122 was repealed and replaced by
Code § 3.2-6570, effective October 1, 2008, subsequent to
final judgment in this case.

Terry Sullivan was the president and executive director of the Fern Leigh Equine Foundation, Inc., a not-for-profit organization that cared for homeless horses on a farm owned by Ms. Sullivan. The foundation's purpose was to care for the horses until homes could be found for them. It was supported by donations and occasional proceeds from the sale of horses. At the time of trial approximately 35 horses were being cared for on the Sullivan property. The subject of this appeal, the horse seen by Ms. Berbes, was a mare approximately 20 years of age named "Dip."

About 7:00 that evening, Ms. Berbes returned to the scene and found that the horse had not moved. She called her mother, asking her to call Ms. Sullivan to tell her that Ms. Berbes intended to enter the Sullivan property to look at the horse. Ms. Berbes testified that she found the horse to be extremely thin and so weak that it could not lift its head off the ground. It was unable to reach a supply of hay, grain and a small pan of water that had been placed on the ground behind it.

Augusta County Animal Control Officer Gary Webb responded to a telephone report of the downed horse and met with Ms. Sullivan and Ms. Berbes in the field beside Dip. Webb testified that the horse had been "down for about 30 hours." Ms. Berbes asked Ms. Sullivan to give the horse to her so that

2

she could care for it.  Ms. Sullivan said that she would do so if Ms. Berbes would assume responsibility for any veterinary bills.  Officer Webb then prepared a document entitled "Surrender Statement by Owner" that Ms. Sullivan signed.  It provided that Ms. Sullivan did "[r]elinquish property rights to Brigette Berbes who will be responsible for vet bills and will vacate property when the vet leaves."

Ms. Berbes then called Dr. Scott R. Reiners, a veterinarian at the Mountain View Equine Hospital.  He arrived at the scene and examined the horse.  He testified that the horse was "nonresponsive to any stimuli, very dehydrated and emaciated."  Because Dip was unable to raise her head to drink from a bucket, Dr. Reiners administered 22 liters of intravenous fluids in the field, placed her on a continuous intravenous drip, transported her to his hospital and gave her drugs and six more liters of fluids.  Despite his efforts, Dip died later that night.  Dr. Reiners expressed the opinion that the horse was in need of emergency care long before his arrival and that the condition in which he found her was not of sudden onset.

Two other veterinarians testified.  Dr. David W. Brown, Laboratory Director and Veterinary Diagnostician at the Harrisonburg Regional Animal Health Laboratory, performed a postmortem examination of Dip.  He found her to be emaciated

and her ribs prominent. He opined that this condition had developed over a considerable period of time, "probably weeks." He found several disease processes affecting the intestines, liver, kidneys, lungs and heart, as well as infestation by intestinal parasites. These had caused the horse to become unable to absorb sufficient nutrition from the food it consumed, leading to its progressive emaciation and weakness. Dr. Brown opined that the immediate cause of death was cardiac fibrosis and colitis.

Dr. William S. Hunter, a practicing veterinarian, had done professional work for Ms. Sullivan for several years. He testified that she called him on April 10, 2008 and told him that she had a horse down; he thought she said it had been down for two days. That surprised him because most horse owners, he said, call a veterinarian immediately when a horse is found down. He testified that he had never known a horse to be "down a day or two and get up and live, [not e]ven with medical treatment."

Dr. Hunter testified that when Ms. Sullivan called him, she told him that she didn't know anything was wrong with Dip but when she removed her blanket she had "just wasted away." She asked him whether the horse should be euthanized and he told her that its prognosis was poor but he could not recommend euthanasia unless he had first examined the horse.

4

Although he was willing to come to the farm to see the horse, she did not ask him to do so, but instead said, "Okay, we can handle this."[2]

Ms. Sullivan testified that after her conversation with Dr. Hunter, she called a friend, Gary Meeks, to euthanize Dip. Meeks was unable to come to the farm that evening, but promised to come the following morning. Dip was removed to the hospital before he could arrive.

Ms. Sullivan was charged by warrant with a violation of former Code § 3.1-796.122. She was tried and convicted in the general district court and appealed her conviction to the Circuit Court of Augusta County. At a bench trial, she was found guilty and sentenced to twelve months in jail, with six months suspended on conditions of good behavior and "no possession of horses" for 24 months. She appealed to the Court of Appeals, which affirmed the conviction in a memorandum opinion with one judge dissenting. Sullivan v. Commonwealth, Record No. 1886-08-3 (Jan. 19, 2010). We awarded her an appeal.

---

[2] The only significant conflict in the evidence was Ms. Sullivan's account of this conversation. She testified that she remembered that Dr. Hunter had advised her "to put [the horse] down," that she had said, "[I]f you think you should come out . . . I want to give her every chance" and that Dr. Hunter replied, "No, no. It's pretty cut and dried."

5

On appellate review of a criminal conviction for sufficiency of the evidence to support the conviction, the relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Appellate courts defer to the findings of fact made by a jury or a trial judge at a bench trial if there is evidence to support them and will not set a judgment aside unless it appears from the evidence that the judgment is plainly wrong.  Code § 8.01-680.  That deference applies not only to findings of fact, but also to any reasonable and justified inferences the fact-finder may have drawn from the facts proved.  Johnson v. Commonwealth, 209 Va. 291, 295, 163 S.E.2d 570, 574 (1968).

Former Code § 3.1-796.122 provided, in pertinent part, that "[a]ny person who . . . (ii) deprives any animal of necessary food, drink, shelter or emergency veterinary treatment . . . shall be guilty of a Class I misdemeanor."  Former Code § 3.1-796.66 provided:  " 'Emergency veterinary treatment' means veterinary treatment to stabilize a life-

threatening condition, alleviate suffering, prevent further disease transmission, or prevent further disease progression."[3]

Applying that definition, we agree with the Court of Appeals' conclusion that there was ample evidence to support a finding that Ms. Sullivan deprived Dip of necessary emergency veterinary treatment. The circuit court could readily have inferred from the expert testimony that the horse was becoming progressively weaker and emaciated over a period of weeks before she went down. The court could properly discard as incredible Ms. Sullivan's account that she was unaware that there was anything wrong with the horse until she found it down, removed the blanket and discovered that it had "just wasted away." The court could properly conclude from the evidence that it would have been apparent, over a considerable period of time, that the horse was in need of veterinary treatment to alleviate suffering and to prevent the progression of disease. At the very least, the court could properly conclude that the horse was in such a condition during a period of 30 to 48 hours before its death that emergency veterinary care was immediately necessary to alleviate suffering, during which time no such treatment was provided.

---

[3] The same definition appears in the replacement statute, Code § 3.2-6500.

## Conclusion

For the reasons stated, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.

---