UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Petty and Senior Judge Annunziata
Argued at Chesapeake, Virginia

JONATHAN DAVID BYNUM

                                                     MEMORANDUM OPINION[*]

v.        Record No. 0854-12-1        BY JUDGE D. ARTHUR KELSEY
                                                         JUNE 4, 2013

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, III, Judge

J. Barry McCracken, Assistant Public Defender (Office of
the Public Defender, on brief), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General
(Kenneth T. Cuccinelli, II, Attorney General, on brief),
for appellee.

The trial court convicted Jonathan David Bynum of indecent liberties with a minor, rape

of a victim under thirteen years of age, aggravated sexual battery, and forcible sodomy.  On

appeal, Bynum claims the court erred in finding the victim competent to testify and in holding

the evidence sufficient to prove his guilt.  We disagree and affirm.

I.

When presented with a sufficiency challenge on appeal, we review the evidence in the

"light most favorable" to the Commonwealth.  Commonwealth v. Hudson, 265 Va. 505, 514, 578

S.E.2d 781, 786 (2003).  This principle requires us to "discard the evidence of the accused in

conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to

the Commonwealth and all fair inferences to be drawn therefrom."  Parks v. Commonwealth,

221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and citation omitted).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

From this perspective, the evidence of Bynum's crimes came from the female victim who was nine years old at the time of the offenses, the victim's mother, Bynum's daughter, and a sexual assault nurse. Since birth, the victim has been deaf and unable to speak. The victim's mother was trained in sign language and, before the trial, had enrolled her daughter in a school for the deaf and blind. The victim and her mother used a basic system of sign language to communicate about the child's hygiene. One finger represented the victim's mouth, two fingers her breast area, and three her vagina.

During the summer of 2010, the victim spent time with Cynthia Winfield, her father's fiancée. In August 2010, Winfield and the victim spent a week visiting Shaneka Kellam, Bynum's daughter. On August 21, 2010, Kellam left her four children and the victim briefly in Bynum's care. When Kellam and Winfield left that morning, Kellam's nine-year-old daughter and the victim were asleep in a bedroom in the back of the house. At that time, Bynum was in the living room with the other children.

When Kellam and Winfield returned approximately one hour later, all the children except the victim were in the living room. The children told Kellam that Bynum and the victim were together in Kellam's bedroom at the front of the house. Kellam went to the bedroom and found the victim looking "petrified" and "scared." App. at 56. Bynum was on the bed, wearing only his pants. He staggered when he got up and appeared to be intoxicated. He was "acting like he was drunk, like he [was] hallucinating." Id. at 66. A twelve-pack of empty beers was on a nearby table. Kellam immediately called the police, who promptly arrested Bynum.

A detective telephoned the victim's mother and advised her that the victim had been taken to the hospital. The mother found her daughter at the hospital, frightened and wearing only her night clothes. The child was examined by a sexual assault nurse who recovered DNA evidence from the victim's vagina, mouth, and other areas of her body. Investigators later

recovered DNA from Bynum for a comparative analysis. The Virginia Department of Forensic Science prepared a certificate of analysis based upon the DNA samples.

The testimony concerning the collection of DNA samples came into the evidentiary record without objection. When the prosecutor offered the certificate of analysis into evidence, however, Bynum's counsel objected on the ground that the prosecutor had failed to follow the admission requirements of Code § 19.2-187.1. Bynum's counsel admitted that he had received a copy of the certificate before trial, but explained that he did not receive the required "notice to the accused of his right to object to having the certificate admitted without the person who performed the analysis or examination being present and testifying." Code § 19.2-187.1(A)(2). The trial court sustained the objection and excluded the certificate of analysis from the evidence.

At trial, the victim, then ten years old, testified through an American Sign Language interpreter. She said she attended a school for deaf children. She was in fifth grade and earned all A's in her math, writing, and reading classes. During *voir dire*, the prosecutor asked the victim a series of questions to establish her competency to testify. The victim, for example, understood the prosecutor was lying when she said there was an elephant in the courtroom and that the victim was wearing a red, not black, shirt while on the witness stand. In those and various other ways, the victim repeatedly said she understood the importance of telling the truth and promised to do so.

Bynum's counsel attempted to impeach the victim's competency by noting the instances in which the interpreter sought clarification from the victim during her testimony. At one point during counsel's *voir dire*, the interpreter interjected that, when using "American Sign Language," App. at 59-60, it was necessary to add clarifications to some types of questions. Bynum's counsel also elicited nonresponsive answers to several questions on cross-

examination, showing that he and the victim were poorly communicating on a variety of subjects.

At the close of *voir dire*, Bynum's counsel moved to preclude the victim from testifying on the ground of incompetency. The trial court denied the motion, finding the victim was "very bright" and "very engaged" in the proceeding. Id. at 83. She was "paying very close attention to the interpreter," the court found, and was "observing everything in the courtroom." Id. at 83-84. Considering the *voir dire* as a whole, the court found the victim had "the ability to observe, to recollect, and to communicate" and "she understands that her job is to tell the truth." Id. at 84. The court offered a detailed explanation for its findings:

> My observation is it is a challenge to communicate with [the victim] for those of us that aren't used to communicating with [her]. Myself and the attorneys are included in that. And so the issues I've seen with her[ ] answers have as much to do with the nature of the questions being posed to her, including by myself, but not so much on her end, her answers. If there's a question that's asked that the nature of the question is not concrete, then you get a little bit of a confused answer. But I do believe she understands the oath, she understands her obligations, and she can observe, recollect, and communicate. Now, when we get to her testimony, how effective her communication is . . . . The question will be eliciting communication the Court finds credible. Essentially, I don't know. But I do believe that this young girl meets all the qualifications to be competent to testify because I do believe she understands the oath and her duty to tell the truth. She understands the difference between something that's made up and something that really happened and is happening . . . . So I find that she is competent, and it's my observation from watching this process that the issues with her testimony — ability and testimony has [sic] more to do with the challenges of communicating with her and asking questions that will elicit a response that has the value that the question is seeking than whether or not she's competent. So I do find she's competent.

Id. at 84-85.

The victim then testified about Bynum's actions on August 21, 2010. She said Bynum began drinking beer just after Kellam and Winfield left the home. Bynum then told her to go into the bedroom with him. Id. at 92. When she complied, Bynum closed and secured the door.

She tried to open the door but could not do so. Bynum ordered her to take off her pants. During her testimony, the victim used the customized sign language developed between her and her mother. The victim referred to her mouth with one finger, her vagina with three fingers, and Bynum's genitals with three fingers.

Using this method of communicating, the victim testified that Bynum placed "his number three in [her] number three and [in her] mouth." Id. at 91-92, 99. When Bynum told her to take off her pants, "[h]e hadn't put it in [her] mouth yet, . . . he took [her] pants off and then finished and then put them back on and then in [her] mouth." Id. at 99. She added that his "number three" went in her "number three" first and "then in [her] mouth second and then again in [her] number three." Id. She pointed to her mouth when asked to point to her "number one" and pointed to "the front of her pants where her zipper is" when asked to point to her "number three." Id. at 108. During her testimony, the victim repeatedly said Bynum's actions "hurt," that "it was awful," and that it "tasted bad." Id. at 91-92, 94, 107, 109. Afterwards, the victim immediately reported the incident to Kellam, Winfield, the police, and her mother and father.

Bynum offered no evidence during his case-in-chief. Instead, his counsel argued the victim's testimony should not be believed, given her nonresponsive answers and the confused communication. Sitting as factfinder, the trial court disagreed, found the victim's testimony credible, and found Bynum guilty as charged.

On the subject of the victim's competency, the court stated its original findings "are more reinforced now from having heard her testimony [and] reviewed the transcript of her testimony." Id. at 194. The court found the victim had "the ability to observe, to recollect, to communicate. She understood the oath. She understood her obligations as a witness in court." Id. The court then directly addressed the concerns raised by Bynum's counsel. As the court reasoned:

> [T]he issue is communicating. To do that one must understand that she
> doesn't live in the auditory world that those of us that can hear and speak

live in. She can't hear words. She cannot speak words. Her method of communication is not auditory is what I will say, but she was able to communicate using sign language. Now, perhaps some day she'll develop to the point where she uses sign language where she can spell words and things like that and understand spelling, visual spelling. But at this point she's not progressed to that point, and I will state for the record that was not the type of sign language that's being used by her and her interpreter in the courtroom. But what I predicted when I found her competent, and turned out to be the case, depends largely on the questions asked. I mean, if you ask this girl what's the name of something, that's not the world she lives in. She doesn't have audible, auditory, vocal names for things. That is not the world she lives in. So from time to time the question was what's that name and you would get a puzzled response because the question is not geared towards her reality or her world. But I do believe that she was able to recollect. I believe she understood the oath. . . . I find no evidence that she had been coached. She was able to relate the events as she recalled them that occurred on the date in question. . . . She was able to respond unless the question was such that it . . . was not geared to actually effectively communicate with her given her disabilities and her reality.

Id. at 194-95.

Concerning the evidence of guilt, the trial court noted that the victim's testimony had been corroborated by Bynum's daughter. Kellam described the victim as appearing "petrified" and "scared" when she saw the victim in the bedroom with Bynum. Id. at 203. Kellam's observation of Bynum lying on the bed and appearing to be drunk further confirmed the victim's allegations. The court also laid heavy emphasis on the victim's demeanor during her testimony:

One thing I noticed throughout her testimony was that as she was recollecting what happened, she was responding emotionally, very much in conformance with the act she was recalling. So she wasn't just . . . just signing what happened but she was agitated. She . . . seemed somewhat upset and she was insistent. In addition to saying it hurt, she was insistent that it hurt. She wanted to say it over and over. Sometimes she said it even when she wasn't specifically asked. I was very much persuaded by the fact that she was responding and acting emotionally as if the recollecting and retelling of the event was having an emotional effect on her, and I found that to be very compelling in terms of judging her credibility and judging whether she actually was recalling actual events that actually happened to her. I found it very — her behaviour on the stand very — what [sic] you would expect of a ten-year-old child recalling such events as opposed to a ten-year-old child that was making something up or not really recalling it correctly. Her emotions were very

- 6 -

> appropriate for what she was being asked to relate that happened to her in her life.

Id. at 203-04.

## II.

On appeal, Bynum makes two arguments seeking a reversal of his convictions. First, he claims the trial court should have never let the victim testify at all. Her *voir dire*, Bynum contends, demonstrated her incompetence as matter of law. Second, he argues that, even if admissible, the victim's testimony was either too inconclusive or too unbelievable to prove his guilt. We disagree with both assertions.

### A. THE VICTIM'S COMPETENCY TO TESTIFY

In Virginia, "[n]o child shall be deemed incompetent to testify solely because of age." Code § 8.01-396.1. This is true in "criminal as well as civil" cases. Code § 19.2-267. Thus, "[t]here is no fixed age at which a child must have arrived in order to be competent as a witness." Davis v. Commonwealth, 161 Va. 1037, 1039, 171 S.E. 598, 598 (1933) (citation omitted); see Durant v. Commonwealth, 7 Va. App. 454, 462, 375 S.E.2d 396, 400 (1988). "A child is competent to testify if [she] possesses the capacity to observe events, to recollect and communicate them, and has the ability to understand questions and to frame and make intelligent answers, with a consciousness of the duty to speak the truth." Akers v. Fauquier Cnty. Dep't of Soc. Servs., 44 Va. App. 247, 265, 604 S.E.2d 737, 745 (2004) (quoting Cross v. Commonwealth, 195 Va. 62, 64, 77 S.E.2d 447, 449 (1953)); see also Greenway v. Commonwealth, 254 Va. 147, 153, 487 S.E.2d 224, 227 (1997).

A trial court may declare a witness "incompetent to testify if the court finds that the person does not have sufficient physical or mental capacity to testify truthfully, accurately, or understandably." Rule 2:601(b). This determination is not one we review *de novo* on appeal. Rather, the "competency of a child as a witness to a great extent rests in the sound discretion of

the trial judge," Ortiz v. Commonwealth, 276 Va. 705, 720, 667 S.E.2d 751, 760 (2008) (quoting Greenway, 254 Va. at 153, 487 S.E.2d at 227), "because of the opportunity of the trial judge to see the child and observe [her] demeanor on the stand," Kiracofe v. Commonwealth, 198 Va. 833, 840, 97 S.E.2d 14, 18-19 (1957); see also Durant, 7 Va. App. at 462, 375 S.E.2d at 400.

We review the trial court's competency determination under the deferential abuse-of-discretion standard. This standard, "if nothing else, means that the trial judge's 'ruling will not be reversed simply because an appellate court disagrees.'" Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743 (citation omitted), adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (parenthetically quoting Thomas, 44 Va. App. at 753, 607 S.E.2d at 743); see also Allen v. Commonwealth, 58 Va. App. 618, 623, 712 S.E.2d 748, 750 (2011).

In this case, we find no basis for Bynum's assertion that the trial court abused its discretion in finding the victim competent to testify. The court meticulously reviewed the communication concerns arising out of the child's nonresponsive answers and determined they could be addressed by clearer, better framed, questions. The court also paid close attention to the victim's demeanor and emotive cues, finding them entirely consistent with her efforts — albeit within the limits of her physical disability — to testify truthfully and completely. The court acknowledged Bynum's suggestion that the victim may have been "unduly influenced by her mother" and may have "rehearsed her story," but rightly concluded that those questions involve "matters affecting the weight of her testimony, not her competency as a witness." Ortiz, 276 Va. at 721, 667 S.E.2d at 761. For these reasons, we cannot conclude the trial court abused its discretion in permitting the victim to testify.

B. SUFFICIENCY OF THE EVIDENCE

Even if the victim was properly found competent to testify, Bynum contends her testimony was "too unreliable, standing alone" to be believed by the factfinder. Appellant's Br. at 15. Bynum also asserts "the lack of any physical or other medical or forensic evidence corroborating the essential facts of [the victim's] version of events" fatally weakens the probative weight of her testimony. Id. at 16. Like the trial court, we disagree with these assertions.[1]

We examine a trial court's factfinding "with the highest degree of appellate deference." Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006). An appellate court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (quoting Cavazos v. Smith, 132 S. Ct. 2, 3 (2011) (reaffirming Jackson standard)).[2] Instead, the only "relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[1] Citing Rushing v. Commonwealth, 284 Va. 270, 726 S.E.2d 333 (2012), Bynum argues that our sufficiency analysis should disregard the victim's testimony because of incompetency and then dismiss the indictments because of the resulting insufficiency of the evidence. Because we disagree with Bynum's first premise — that the victim was incompetent to testify — we need not engage in any detailed analysis of Rushing. It bears mentioning, however, that the General Assembly reversed this aspect of Rushing by statute. See 2013 Va. Acts ch. 675 (enacting Code § 19.2-324.1, effective July 1, 2013). Further, any dismissal under Rushing would not prejudice the Commonwealth's right to re-indict Bynum under double jeopardy principles. See Lockhart v. Nelson, 488 U.S. 33, 40 (1988).

[2] Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011); Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010); Prieto v. Commonwealth, 278 Va. 366, 399, 682 S.E.2d 910, 927 (2009); McMillan v. Commonwealth, 277 Va. 11, 19, 671 S.E.2d 396, 399 (2009); Jones v. Commonwealth, 277 Va. 171, 182, 670 S.E.2d 727, 734 (2009); Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008).

Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010) (emphasis added) (citing Jackson, 443 U.S. at 319).  Thus, "it is not for this court to say that the evidence does or does not establish his guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion."  Cobb v. Commonwealth, 152 Va. 941, 953, 146 S.E. 270, 274 (1929).

This deferential appellate standard "applies not only to the historical facts themselves, but the inferences from those facts as well."  Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 907 (2009) (*en banc*) (citation omitted); see also Sullivan, 280 Va. at 676, 701 S.E.2d at 63-64.  "Thus, a factfinder may 'draw reasonable inferences from basic facts to ultimate facts,'" Tizon v. Commonwealth, 60 Va. App. 1, 10, 723 S.E.2d 260, 264 (2012) (quoting Haskins v. Commonwealth, 44 Va. App. 1, 10, 602 S.E.2d 402, 406 (2004)), "unless doing so would push 'into the realm of *non sequitur*,'" id. (quoting Thomas, 48 Va. App. at 608, 633 S.E.2d at 231).

In a bench trial, a trial judge's "major role is the determination of fact, and with experience in fulfilling that role comes expertise."  Haskins, 44 Va. App. at 11, 602 S.E.2d at 407 (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)).  "When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree."  Towler v. Commonwealth, 59 Va. App. 284, 291, 718 S.E.2d 463, 467 (2011) (citation omitted).  Consequently, "we do not substitute our judgment for that of the fact finder," Hamilton v. Commonwealth, 279 Va. 94, 105, 688 S.E.2d 168, 175 (2010), even if our "opinion might differ," Startin v. Commonwealth, 281 Va. 374, 379, 706 S.E.2d 873, 876-77 (2011); Courtney v. Commonwealth, 281 Va. 363, 366, 706 S.E.2d 344, 346 (2011).  "If reasonable jurists could disagree about the probative force of the facts," Holloway v. Commonwealth, 57 Va. App. 658, 664, 705 S.E.2d 510, 513 (2011) (*en banc*) (citation omitted), the "reviewing court is not

permitted to substitute its own judgment" for that of "the finder of fact at the trial," <u>Courtney</u>, 281 Va. at 366, 706 S.E.2d at 346.

Applying this deferential standard of review, we hold a rational factfinder could conclude the evidence proved Bynum's guilt beyond a reasonable doubt. The victim's narrative is not at all unbelievable. She described a grown man binging on beer earlier in the morning, calling her into a bedroom, and then molesting, sodomizing, and raping her. Using the rudimentary, but effective, method of sign language she learned from her mother, the victim testified that Bynum put his genitals "in" and "inside" her vagina and "in" her mouth. App. at 75-79, 81. The victim repeatedly said Bynum's actions "hurt," that "it was awful," and that it "tasted bad." <u>Id.</u> at 91-92, 94, 107. Immediately after the incident, the victim reported what happened to Kellam, Winfield, the police, her mother, and her father. Kellam's observations of Bynum confirmed several aspects of the victim's testimony.

On each of the charges, the trial court made specific factual findings. It found that Bynum violated Code § 18.2-370.1 (taking indecent liberties with a child) when he told her to take off her clothes. App. at 204. The court found Bynum violated Code § 18.2-67.3 (aggravated sexual battery) when he "touch[ed] her genitalia in various fashions" with the intent to sexually gratify himself. <u>Id.</u> at 205. Addressing the rape and forcible sodomy charges, the trial court noted the young victim's difficulty in naming sexual organs: "[S]he's not going to give you the word 'penis.'" <u>Id.</u> The court nonetheless concluded: "She was asked and she clearly stated that her number three was her vagina. . . . I'm very satisfied from her description of her numbering system . . . that when she refers to her number three, she is talking very specifically about her vagina and her genitalia." <u>Id.</u> at 205-06.

"[W]hen it came to the defendant's number three," the court explained, the victim "clearly indicated at a minimum that when she was referring to [the] number three of the

- 11 -

defendant, she was referring to his crotch area at a minimum, if not specifically his genitalia or his penis." Id. at 206. In making those findings, the court sensibly interpreted the evidence within its proper context:

> [I]t's a question of not losing sight of the forest for the trees. What else in his crotch area is he putting in her vagina that hurt . . . ? What else in his crotch area is he putting into her mouth in the context of sexual molestation that would taste bad? The only thing that makes any sense is — human experience is he was placing his penis in her vagina and his penis in her mouth. . . . At one point she was even specific to say that he took her pants off. He put his number three inside of her number three. He then put it inside her mouth and then put in her number three again. . . . [After he] put his number three into her number three [she] said, "After he was finished," he put it in her mouth and then back in number three. So, again, a little child describing "after he was finished," I think she's describing the act of rape. So I do find the defendant guilty of rape, and I find him guilty of forcible sodomy for the reasons stated.

Id. at 206-08. We find the trial court's reasoning compelling.[3] And, as we have often said, "the testimony of a single witness, if found credible by the trial court and not found inherently incredible by this Court, is sufficient to support a conviction." McCary v. Commonwealth, 36 Va. App. 27, 41, 548 S.E.2d 239, 246 (2001).

Bynum also argues on appeal that, among other evidentiary deficiencies, the absence of "forensic evidence" should be considered as an exculpatory circumstance from which the trial court should have inferred his innocence. Appellant's Br. at 16, 19. We disagree.

It is true, as a general matter, that a factfinder may consider a criminal defendant's unexplained "failure or neglect . . . to produce evidence within his power" as an incriminating circumstance. Pollino v. Commonwealth, 42 Va. App. 243, 251, 590 S.E.2d 621, 625 (2004)

---

[3] Given the testimony by the child witness, we find meritless Bynum's assertion that the evidence "may have established the fact of contact, but it certainly did not establish the requisite element of penetration," Appellant's Br. at 21. See, e.g., United States v. Ruppel, 45 M.J. 578, 588 (A.F. Ct. Crim. App. 1997) ("tasted bad implies penetration"); State v. Toohey, 816 N.W.2d 120, 130-32 (S.D. 2012) ("where the victim experienced some pain from the genital touching . . . rational jurors could find proof of penetration beyond a reasonable doubt").

(quoting Robinson v. Commonwealth, 165 Va. 876, 880, 183 S.E. 254, 256 (1936)); see also

Russell v. Commonwealth, 216 Va. 833, 836, 223 S.E.2d 877, 879 (1976). [4] And we accept that

the inverse is likewise true: The "failure of the Commonwealth" to present available, material

evidence permits the inference that the evidence "would not have been favorable." Robinson v.

Commonwealth, 207 Va. 66, 69, 147 S.E.2d 730, 732 (1966).

Ordinarily, then, it would be significant to learn in a sexual assault case that investigators

obtained a DNA analysis of the victim and the alleged perpetrator but, for inexplicable reasons,

the prosecutor failed to present that evidence to the factfinder. But, of course, that is not what

happened in this case. The Commonwealth presented extensive evidence from the sexual assault

nurse and police officers concerning the collection of DNA samples from the victim and from

Bynum. When the Commonwealth sought to introduce the certificate of analysis itself, Bynum

successfully objected to its admission on the ground that the prosecutor had not given Bynum's

counsel adequate forewarning of the proposed use of the certificate of analysis at trial.

Thus, the certificate of analysis was never admitted into evidence not because the

Commonwealth inexplicably failed to offer it — but because Bynum insisted that it be excluded.

The missing-evidence inference applies only when the party fails *without a credible explanation*

to offer evidence that would be thought to favor that party.[5] Given Bynum's success in

---

[4] A criminal defendant has a constitutional right not to testify. "But from this must be distinguished his failure by *other* evidence to rebut the evidence on a given point where it is apparently in his power to produce such evidence without waiving his privilege; this of course tells against him." 1 Simon Greenleaf, Law of Evidence § 195b, at 327 (16th ed. 1899) (emphasis added). "The rule even in criminal cases is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the [permissible inference] that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121 (1893). This inference stems from a "general rule that runs through all the doctrine of trials." 3 William Blackstone, Commentaries *368.

[5] Inherent in the principle is that the evidence "must be within the knowledge and power of the party to produce" and the "inference suggested by the conduct of the party may always be

excluding this forensic evidence, he cannot now claim that its absence casts doubt on the other, independently sufficient, evidence proving Bynum's guilt.[6]

### III.

The trial court did not abuse its discretion in permitting the ten-year-old victim to testify at Bynum's trial. Nor did the trial court, sitting as factfinder, irrationally conclude the evidence proved Bynum's guilt beyond a reasonable doubt. We thus affirm his convictions.

<u>Affirmed.</u>

---

explained away by him, if possible, — as by showing that the witness is ill or has fled the country, or the like." 1 Simon Greenleaf, *supra* § 195b, at 326-27.

[6] While "the propriety of such an inference in general is not doubted," it is "unquestionable" that the inference "is not available from mere nonproduction where the *document* would have been *inadmissible*." <u>Wigmore on Evidence</u> §§ 285, 291, at 192, 226 (Chadbourn rev. 1979) (emphasis in original); <u>see</u> <u>generally</u> 1 Burr W. Jones, <u>Law of Evidence: Civil and Criminal</u> § 29 (5th ed. 1958) ("No unfavorable inference arises from a failure to produce evidence . . . which would not be admissible without the consent of the other party.").