COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Russell and Athey
Argued by teleconference

PUBLISHED

DONNIE ELIJAH SMALLWOOD

v.       Record No. 0375-19-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
MAY 12, 2020

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

Matthew L. Pack (M. Pack Law, PLLC, on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

On April 16, 2018, appellant Donnie Elijah Smallwood ("Smallwood") was indicted by a

grand jury in the Circuit Court of Pittsylvania County ("circuit court") for three counts of

conspiracy to obtain money by false pretenses, in violation of Code §§ 18.2-178, 18.2-22. After

a bench trial on November 26, 2018, Smallwood was convicted of all three counts.

On appeal, Smallwood assigns the following two errors:

I. The trial court erred by denying the Defendant's motion to
strike and renewed motion to strike for lack of sufficient
evidence. The trial court erred in finding that the evidence was
sufficient to convict the defendant of multiple conspiracies to
obtain money by false pretenses in violation of 18.2-178 and
18.2-22 of the Code of Virginia, as amended, because the
evidence failed to show that the Defendant entered into multiple
conspiracies. Instead, the evidence supports a single
overarching conspiracy. In finding the evidence sufficient to
prove multiple conspiracies, the trial court violated the
Defendant's right against double jeopardy pursuant to the Fifth
Amendment to the Constitution of the United States.

II. The trial court erred in finding that the evidence was sufficient
to convict the Defendant of multiple counts of Conspiracy to

Obtain Money by False Pretenses in violation of Sections 18.2-22 and 18.2-178 of the Code of Virginia, 1950, as amended, because the evidence only supported a singular, fraudulent scheme to defraud multiple persons.

## I. BACKGROUND

Walter Hamilton, Jr. ("Hamilton") has known Smallwood since 2003 when Smallwood became romantically involved with Hamilton's mother, Monica Boone ("Boone"). Hamilton continued to view Smallwood as his father, even though Smallwood and Boone divorced in 2005. Smallwood has also been incarcerated since 2005. During the year before Smallwood went to prison, he made $30,000 from his business.

On December 15, 2016, Hamilton, then a Virginia Beach police officer, contacted Ron Hall ("Mr. Hall"), Assistant Chief of Virginia Department of Corrections Special Investigations Unit. Hamilton identified himself as a police officer and requested an investigation into an allegation that Smallwood assaulted a prison guard. Mr. Hall's conversation with Hamilton sparked suspicion that Hamilton was not truly a police officer,[1] so Mr. Hall accessed Smallwood's calls with Hamilton. Mr. Hall discovered what he believed to be a "scam" in which Smallwood and Hamilton were trying to obtain money from someone. Mr. Hall contacted the Virginia Beach Police Department and assigned Special Agent Craig O'Der to conduct further investigation.

At trial, during opening statement, the Commonwealth alleged that Hamilton and Smallwood participated in a "Ponzi scheme." Later, during the presentation of evidence, Hamilton testified that he and Smallwood decided to create a "holding company" so that Hamilton could clear his credit and be able to take out loans. Hamilton also told Smallwood that they would first get money from Perry Thomasson ("Perry"), the owner of a funeral business

---

[1] The Virginia Beach Police Department later confirmed that Hamilton was actually a police officer.

who had known Hamilton for ten years; then they would get money from a man named Oliver Williams—whom they referred to as "O"—and use O's money to reimburse Perry. Hamilton knew "O" from business ventures in which Hamilton tried to involve himself. Despite the plan with Smallwood, neither Perry nor O received any money.

At trial, the Commonwealth introduced nine of the phone calls between Smallwood and Hamilton.[2] During some of the calls, Hamilton would connect the call to third parties so that Smallwood could speak to them.

The first call the Commonwealth introduced was from December 12, 2016. Smallwood called Hamilton and discussed drawing up a contract that would include, among other things, that the business should go into effect within thirty days. In order to get started, Smallwood and Hamilton planned to "create an account through Bank of America." After a third party deposited money into the account, Smallwood directed Hamilton to send him $4,000 and to send Dontez, Smallwood's son, $4,000. Hamilton could do what he wanted with the remainder of the money. Then, Smallwood planned to "go to the next guy." Next, Hamilton expressed concern about his credit. He said he would "get a little bit here, get a little bit there, pay the credit off, and then go get a loan and start making payments towards these individuals." Hamilton told Smallwood that it would take about $15,000 to fix his credit. In planning the rest of the operation, Smallwood talked about getting money from "O," stating, "If we can get O . . . to get on board, I'm pretty sure I'm going to try to push him to make him think I can give up 225 stacks right away. But, on

_____

[2] By citing to the Commonwealth's opening statement and closing argument in their statements of fact, instead of the actual evidence in the case, the parties made it difficult for this Court to find the relevant evidence in the record. Additionally, both parties failed to include any citations to the index of phone calls or time stamps from those calls. Hundreds of phone calls between Smallwood and Hamilton and others were recorded and made part of this record, but only nine of them were actually played for the circuit court. Yet, all of them were submitted to this Court in a format that made it extremely difficult to locate those calls that were actually considered by the circuit court in reaching its verdict.

the 225 stacks, he [is] gonna have to give me at least 17 G's down." Smallwood stated that he knew what to do in order to "make it clean itself up."

Next, the Commonwealth introduced a second call from December 13, 2016, at 10:10. Smallwood discussed moving money around so that people would not realize there was no money to repay them. After that, the Commonwealth played a third call from December 11, 2016. Hamilton connected the call with Perry so that Smallwood and Perry could talk. Smallwood stated that he had something for Perry to consider, where Perry would be able to "eat," and Smallwood would also "eat." In the call, Smallwood clarified that he called money "eating." Smallwood explained that this plan would help him avoid paying money to the IRS and that the setup would allow everyone to "eat good." Smallwood assured Perry that the arrangement would not profit Hamilton and would not "put [any] money in [anyone] else's pocket" than his own.

The Commonwealth introduced a fourth call from later the same day. Smallwood and Hamilton discussed targeting another individual who was in the landscaping business and doing well financially. The remainder of the call consisted of additional planning for how they would go about creating an account and discussion about people they could approach about getting involved.

Then, the Commonwealth introduced a fifth call from December 13, 2016, at 10:32 in which Smallwood and Hamilton discussed how to approach "O." Smallwood told Hamilton, "It seems like what we need to do with this dude, O, is catch him before he get[s] going. . . . You gotta catch him with his thinking cap not really moving too fast." During the sixth call, from later the same day, Smallwood tried to convince "O" to invest. Smallwood told "O" that Smallwood already had a business that he had "pushed to the next level" and that he tries "not to give the IRS all [his] money every year." He claimed, "Last year I put out almost 3.5 million

dollars in taxes alone. I am not trying to give that money up again this year." Smallwood promised that the money would go directly to "O" and not to Hamilton.

Next, during the seventh and eighth calls, which occurred on December 14, 2016, Smallwood pitched his ideas to a man named Geary McDowell ("McDowell") and a man named "Tom." Smallwood agreed to place two million dollars into a bank account, but wanted his money back within a certain amount of time. In order to get the two million dollars, Smallwood told the men that they would need to deposit about "170 grand" to "180 grand" into the account. Smallwood stated that he had the money and would "stick to [his] side of the bargain."

In the ninth and final call the Commonwealth introduced, which occurred later on December 14, 2016, Smallwood spoke with Perry again. Perry asked for $100,000, and Smallwood stated that it would not be a problem. In order to receive the money, Smallwood told Perry he would first have to deposit $4,800 into the account. When Perry became suspicious and asked from where the money he was to receive would be coming, Smallwood stated that Smallwood owned his own business. Perry asked whether Smallwood was in jail, to which Smallwood responded that he was not in jail, but his situation was "deeper than being in jail."

In ruling, the circuit court found that the plan to defraud began on December 11, 2016 with the initial phone call described above. The calls continued, discussing and developing the plan in more detail. Finally, the circuit court stated that the first call played, "puts the plan together on trying to get money. You weren't able to get it from the first two, then you went to the third one, and none of the money panned out." The circuit court found Smallwood guilty on all three counts of conspiracy to obtain money by false pretenses.

## II.  ANALYSIS

### A.  Standard of Review

"On appellate review of a criminal conviction for sufficiency of the evidence to support the conviction, the relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Sullivan v. Commonwealth, 280 Va. 672, 676 (2010) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Brown v. Commonwealth, 68 Va. App. 44, 55 (2017) (quoting Jackson, 443 U.S. at 319).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  Pijor v. Commonwealth, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).

### B.  Sufficiency of the Evidence

As Smallwood has framed his assignments of error in his brief, both concern the sufficiency of the evidence that there were multiple conspiracies.  However, his first assignment of error alleges that finding sufficient evidence of multiple conspiracies violates his Fifth Amendment right against double jeopardy under the United States Constitution.  As a preliminary matter, we do not reach this assignment of error because it was not raised in Smallwood's petition for appeal, or at trial.[3]  See Rule 5A:12(c)(1)(i) ("Only assignments of

---

[3] In fact, the entire first assignment of error in the petition for appeal differs from the one in Smallwood's appellate brief.  Smallwood's petition does not mention a motion to strike, but merely the trial court's alleged error of finding the evidence sufficient.  The first assignment of error in the petition also addresses Smallwood's "specific intent to form an agreement with Hamilton," which is not raised in his appellate brief.

- 6 -

error assigned in the petition for appeal will be noticed by this Court."). Thus, we only consider whether the evidence was sufficient to convict Smallwood of multiple counts of conspiracy to obtain money by false pretenses.[4]

Smallwood was convicted under Code § 18.2-22. This statute states in relevant part, "If any person shall conspire, confederate or combine with another . . . to commit a felony within this Commonwealth, . . . he shall be guilty of a felony." Code § 18.2-22(a). In this case, each indictment asserted a plan to violate Code § 18.2-178, which defines the crime of false pretenses. Essentially, Smallwood argues that the evidence demonstrates that there was only a single plan to defraud multiple victims rather than three plans, each of which was designed to defraud individual victims. In resolving this issue, we are mindful that the language of the conspiracy statute is to be "strictly construed against the Commonwealth." Cartwright v. Commonwealth, 223 Va. 368, 372 (1982).

A conspiracy is "an agreement between two or more persons by some concerted action to commit an offense." Combs v. Commonwealth, 30 Va. App. 778, 787 (1999) (quoting Feigley v. Commonwealth, 16 Va. App. 717, 722 (1993)). "Code § 18.2-22, conspiracy to commit a felony, is violated when two or more persons agree to commit a felony offense, regardless of whether any act in furtherance of the underlying crime has been performed." Jones v. Commonwealth, 279 Va. 295, 301 (2010). In general, the unit of prosecution for conspiracy is the number of agreements. Thus, the number of conspiracy convictions ordinarily depends upon the number of agreements formed. See Williams v. Commonwealth, 12 Va. App. 912, 913-16, 919 (1991) (*en banc*) (finding that Williams was guilty of two conspiracies to distribute

---

[4] On brief, Smallwood concedes that the Commonwealth presented sufficient evidence of a single conspiracy.

marijuana because there was sufficient evidence to support a jury finding of two separate agreements).

However, in the Commonwealth it is sometimes the case that a single agreement can support multiple conspiracy convictions. The Supreme Court of Virginia departed from the notion that Code § 18.2-22(a) simply restated the common law elements of a conspiracy, and it established an exception to this general rule in Cartwright v. Commonwealth, 223 Va. 368 (1982). In that case, the Court held that "a single agreement can form the basis for multiple violations of Code § 18.2-22." Cartwright, 223 Va. at 372. Cartwright and his brother formed one agreement to commit three offenses: (1) to rob an employee of Tidewater Macke Company, (2) to commit capital murder of this employee, and (3) to murder a guard. Id. at 370. Cartwright argued that he could only be found guilty of one conspiracy because there was only one agreement. Id. at 371. The Court noted that conspiracies are illegal in order "to punish the special dangers inherent in group criminal activity" and "to permit preventative steps against those who show a disposition to commit crime." Id. at 372. The Court also explained, "In enacting Code § 18.2-22, the General Assembly determined that *all conspiracies are not the same*. Conspiracies to commit more serious crimes are punished more severely."[5] Id. (emphasis added). Ultimately, that Court held that because Cartwright agreed to commit three different crimes of varying and extreme severity, he was subject to three convictions under Code § 18.2-22. Id.

---

[5] Although unclear, presumably at least one factor in the distinction drawn by our Supreme Court being referenced here is that found between sections (1) and (2) of Code § 18.2-22. "(1) Every person who so conspires to commit an offense which is punishable by death shall be guilty of a Class 3 felony" and "(2) Every person who so conspires to commit an offense which is a noncapital felony shall be guilty of a Class 5 felony." Code § 18.2-22(a). The single agreement in Cartwright involved both the commission of capital and non-capital crimes.

Consequently, it seems to us that after Cartwright, when a single agreement encompasses multiple crimes that are different and have different punishments, a single agreement can be punished as multiple conspiracies—one for each offense contemplated. See id.; see, e.g., Wooten v. Commonwealth, 235 Va. 89, 91-93 (1988) (holding that a single agreement to commit multiple drug offenses with different penalties constitutes multiple conspiracies under Code § 18.2-256).

However, this case is easily distinguished from Cartwright, and we conclude that the Cartwright exception is inapplicable. Cartwright involved both capital and non-capital crimes, whereas this case involves a single plan to commit multiple underlying instances of a single, non-capital crime—obtaining money by false pretenses, a Class 4 felony. See Code § 18.2-178. Therefore, we conclude that the common law rule that the number of convictions depends upon the number of conspiratorial agreements is operable in this situation.

The circuit court found that there was a single agreement here, and the evidence in the record supports that conclusion. See Williams, 12 Va. App. at 915-16 (stating that the question of whether there is a single conspiracy or multiple conspiracies is a factual issue). From the record it is evident that Smallwood and Hamilton agreed to set up a single fraudulent scheme in the nature of a "Ponzi" or pyramid scheme to obtain money from multiple individuals so that Hamilton could pay off his creditors and overcome his financial difficulties. There is evidence of a single plan to use these "investors'" money to reimburse other earlier investors before any of the victims realized that Smallwood and Hamilton were using their money for personal gain. Although the record contains evidence that Smallwood and Hamilton targeted three victims—McDowell, Perry, and "O"—there is evidence that from the beginning, the plan was to target as many people as they could to become "investors." Moreover, the fact that the plan necessarily required multiple victims in order to work also suggests the existence of a single

plan. Because the circuit court found that there was only a single agreement, it should have only

convicted Smallwood of one count of conspiracy to obtain money by false pretenses and

sentenced him accordingly.[6]

### III. CONCLUSION

For these reasons, we find that the circuit court erred in convicting Smallwood of

multiple conspiracies. Therefore, the judgment of the circuit court is reversed and the case

remanded with direction that two of the conspiracy convictions be vacated and those indictments

dismissed.

<u>Reversed and remanded.</u>

---

[6] Smallwood relies on the <u>United States v. MacDougall</u>, 790 F.2d 1135 (4th Cir. 1986), factors as set forth in <u>Bowman v. Commonwealth</u>, 11 Va. App. 259 (1990), to support his position. In <u>Barber v. Commonwealth</u>, 5 Va. App. 172, 177-78 (1987), we adopted the <u>MacDougall</u> test from the Fourth Circuit Court of Appeals as a mechanism to determine the number of conspiracies the evidence in a case supports. Under the test, this Court must examine the "totality of the circumstances" and consider the following factors:

> (1) time periods in which the activities occurred; (2) the statutory offenses as charged in the indictments; (3) the places where the activities occurred; (4) the persons acting as coconspirators; and (5) the overt acts or any other descriptions of the offenses charged which indicate the nature and scope of the activities to be prosecuted.

<u>Id.</u> However, Smallwood's reliance on this test is superfluous. In both <u>Barber</u> and <u>Bowman</u>, we applied this test to determine whether there was a single agreement to commit multiple offenses, or multiple agreements to commit multiple offenses. <u>See Bowman</u>, 11 Va. App. at 265-66; <u>Barber</u>, 5 Va. App. at 177-78. In this case, the circuit court already found that the evidence demonstrates that targeting multiple victims was part of Smallwood and Hamilton's single agreement. Smallwood does not dispute this finding and acknowledges that there was a single agreement. Thus, we need not apply the <u>MacDougall</u> test.