UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales and Athey
Argued by videoconference

RAYMONE ONEAL MURRAY

                                                   MEMORANDUM OPINION* BY
v.        Record No. 0989-24-2                     JUDGE CLIFFORD L. ATHEY, JR.
                                                   DECEMBER 30, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF AMELIA COUNTY
Joseph M. Teefey, Jr., Judge

Preston G. Williams (The Williams Law Firm, PLLC, on brief), for
appellant.

Leah A. Darron, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial held on March 3, 2023, the Circuit Court of Amelia County ("trial

court") convicted Raymone Oneal Murray ("Murray") of soliciting the commission of murder

pursuant to Code § 18.2-29.  The trial court sentenced Murray to ten years of incarceration with

seven years suspended.  On appeal, Murray challenges the sufficiency of the evidence establishing

that his statements "infer[red] an intent to kill or murder."  Finding the evidence sufficient, we

affirm his conviction.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

I.  BACKGROUND[1]

In 2021 and 2022, Murray posted a series of statements on his Facebook page expressing, in racially denigrating language, his hatred and disgust for his father, Raymond Murray ("Raymond").  There were 15 posts where he disparaged Raymond.  These posts included statements like: "I hope [Raymond] fall with his gun an[d] die this hunting season"; "[t]he doctor told me [Raymond] only got a few years left[,] [and] I told him make it six mouths [sic] I'll buy you a drink"; and "[w]hen [Raymond] die the morning of the funeral I'm [going to] go run a water hose to his burial site an[d] fill that bitch up like a tub."

On May 8, 2022, Raymond's wife, Laverne Murray ("Laverne"), viewed Murray's most recent post on Facebook.  The contents of the post caused her so much concern for Raymond that she showed him the post.  Murray's post included a photograph of Raymond and stated as follows:

> If y'all see this nigga ass boy any where round do his ass [i]n [f]or
> me I'll bless you later his address is 15940 Ruffin [L]ane Amelia
> [V]a 23002 look for carport I'll bless you an[d] the kkk y'all owe
> me one fuck him an[d] his mother on this day two fucking tree
> jumping monkeys an[d] his grandma Martha.

Both Raymond and Laverne believed that the phrase "do [him] . . . [i]n" was meant as a request for someone to murder Raymond.  As a result, Raymond and Laverne reported the contents of the posted message to law enforcement.  Murray was subsequently arrested and charged with solicitation of murder in violation of Code § 18.2-29.

At trial, the Commonwealth entered in evidence the 15 prior Facebook messages posted by Murray.  The Commonwealth also introduced in evidence voicemails left by Murray on

---

[1] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'"  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

Raymond and Laverne's answering machine containing racially-charged language.[2]  Both Raymond and Laverne identified Murray's voice from the recorded messages, which were played for the jury.  The phone messages left by Murray consistently denigrated, disparaged, and threatened Raymond.

The jury subsequently convicted Murray of solicitation of murder in violation of Code § 18.2-29.  Murray appealed.

## II.  ANALYSIS

### A.  *Standard of Review*

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one."  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).

### B.  *The evidence was sufficient to show that Murray intended to persuade someone to murder Raymond.*

Murray claims that the evidence was insufficient to support his conviction of solicitation of murder.  We disagree.

---

[2] The Commonwealth also introduced a recording of threatening voicemails that Murray left on Raymond and Laverne's answering machine.  The recording of the voicemails introduced at trial is not before this Court on appeal because they were destroyed.  But testimony about those voicemails is contained in the trial transcript and, thus, part of the record.  *See* Rule 5A:7(a)(7).

Under Code § 18.2-29, anyone "who commands, entreats, or otherwise attempts to persuade another person to commit a murder" is guilty of criminal solicitation, punishable by 5 to 40 years of imprisonment. "Criminal solicitation involves the attempt of the accused to incite another to commit a criminal offense. 'It is immaterial whether the solicitation is of any effect and whether the crime solicited is in fact committed . . . . The gist of [the] offense is incitement.'" *Branche v. Commonwealth*, 25 Va. App. 480, 490 (1997) (alterations in original) (quoting *Huffman v. Commonwealth*, 222 Va. 823, 827 (1981)). And this means that "[t]he conduct constituting the act of solicitation must . . . be done with the intent 'to induce another to act.'" *Ford v. Commonwealth*, 10 Va. App. 224, 227 (1990) (quoting *Pedersen v. City of Richmond*, 219 Va. 1061, 1067 (1979)).

Generally, expressions of desire are insufficient evidence of an intent to incite another to act. *See id.* at 228. For example, in *Ford*, the male defendant approached a car and spoke to two women seated inside the vehicle. *Id.* at 225. He first asked them if they were students at a nearby college. *Id.* He then mumbled to himself before stating that he wanted to have oral sex with them (which was a felony at the time).[3] *Id.* at 225-26. This Court reversed the man's conviction of solicitation of a felony because the man did not "[speak] to [the women] with the intent 'to induce' either of them to act." *Id.* at 228. The Court explained that "expression[s] of his own *desire*" did not constitute an attempt to persuade. *Id.* (emphasis added). The Court also reasoned that there was no accompanying conduct that would push the statements beyond mere expressions of desire. *Id.* at 226 (reasoning that the man made no movements toward the car after making the statements and that he did not offer money in exchange for oral sex).

---

[3] The General Assembly amended Code § 18.2-361(A) to remove criminal liability for such acts. *See* 2014 Va. Acts ch. 794.

Here, we hold that the evidence, taken as a whole, was sufficient for a rational factfinder to conclude that Murray solicited another to commit murder. In the May 8th post, Murray supplied Raymond's photo and charged someone to "do his ass [i]n." In addition, Murray offered something in exchange for another committing murder by stating that he would later "bless" the murderer following the commission of the crime. While offering benefits, monetary or otherwise, is not required pursuant to the statute, *see Smith v. Commonwealth*, 85 Va. App. 483, 495-96 (2025), a rational factfinder could take this offer as evidence of Murray's intent to persuade an individual reading the post to murder his father. *Cf. Pedersen*, 219 Va. at 1067 ("All the evidence bearing upon . . . intent is relevant to a determination of . . . guilt or innocence."). Murray also provided Raymond's photograph, his address, and that Raymond's home had a carport to ease the ability for a potential murderer to find Raymond in order to commit the murder. This evinces an "attempt to persuade" within the meaning of Code § 18.2-29.

In addition, numerous additional postings, as well as phone messages left by Murray, support the conclusion that Murray wanted harm to come to his father. For example, in Murray's 15 prior Facebook posts, he went on similar tirades concerning his hatred for his father using the same derogatory, racist, and threatening language he used in the May 8th post. Based upon the transcript of the trial, Murray also left voicemails using similar derogatory, racist, and threatening language for his father. Thus, upon the totality of Murray's communications both private and public, we find that a rational factfinder could have concluded that Murray initially hoped that Raymond would be killed and that the May 8th post went further and expressed a willingness to achieve his desires by enticing another to murder his father. Expressed differently, the May 8th post crossed over into a solicitation because it aimed to achieve through another what Murray had long desired: Raymond's death. *See Huffman*, 222 Va. at 828

(considering "the relationship of the parties" to find a fraught relationship could explain why a solicitor's "only way to accomplish her objective was to arrange for the murder of [her target]").

In addition, unlike the defendant in *Ford*, Murray did not merely state that he *wanted* his father to die nor express that he *hoped* someone would kill his father. Instead, Murray solicited someone else to "do his ass [i]n." He also provided an incentive to commit the murder, stating "I'll bless you later," and provided a photograph of his father and the address where he lived. We find that these additional facts further distinguish this case from what happened in *Ford*, which involved mere expressions of desire. Thus, we conclude that a rational factfinder could have found that the May 8th post, when considered in the context of all the evidence, was sufficient to establish that Murray solicited the murder of his father.

Lastly, Murray claims that the May 8th post is merely a "vague comment" and, therefore, too imprecise to be solicitous because 1) the post is not addressed to any particular person; 2) the post contained no language that "would incite someone to take action"; and 3) the post "does not specifically call for his father to be murdered." But limiting Code § 18.2-29 to highly-precise solicitations leads to practical problems that our case law has long recognized.

First, defendants are often not transparent when soliciting criminal acts and often use slang. *See Huffman*, 222 Va. at 825 (asking that "somebody [be] done away with" instead of asking that they be murdered); *Branche*, 25 Va. App. at 484-85 (asking for a "blowing" instead of asking for oral sex). While a jury may not know all slang expressions, some "are well known and matters of common knowledge" such that a jury "could reasonably . . . infer[] from the circumstances" that the expression is a solicitation to commit a felony. *Branche*, 25 Va. App. at 491. Indeed, "[i]t would be completely unrealistic to require that witnesses . . . describe the acts constituting the commission of crimes in statutory or technical language" to prove that someone

solicited their occurrence. *Id.* (quoting *Anderson v. State*, 235 S.E.2d 675, 677 (Ga. Ct. App. 1977)).

A standard requiring the kind of precise communication advocated by Murray would cause additional problems because a person soliciting a crime often does not identify the intended target with a name or other identifying information. *See Huffman*, 222 Va. at 825 (describing the target through their age and location, not their name); *see also Armes v. Commonwealth*, 3 Va. App. 189, 190-192 (1986) (using the pseudonym "Jack's wife" to identify the target and never her actual name). This makes circumstantial evidence—as opposed to specific and direct evidence—critical for identifying the solicitor and his target. *See, e.g.*, *Armes*, 3 Va. App. at 196 (holding that a rational factfinder could find that the prosecution met its burden with circumstantial evidence when the solicitor was anonymous). In fact, our Supreme Court has expressly rejected Murray's contention, stating that it "is no defense" that solicitors do not "specify [their target's] exact identity." *Huffman*, 222 Va. at 828.

Accordingly, Murray's contentions concerning the sufficiency of the evidence in support of his conviction fail. Although the post is written in slang, the slang expressions that Murray used "are well known and matters of common knowledge." *Branche*, 25 Va. App. at 491. Further, the jury "could reasonably have inferred from the circumstances" that Murray intended to persuade someone to kill his father. *Id.* Hence, the May 8th post may reasonably be construed as an incitement for a person to murder Raymond in exchange for a later reward. Thus, a rational factfinder could have concluded beyond a reasonable doubt that Murray was guilty of soliciting the murder of his father.

## III. CONCLUSION

For these reasons, we affirm the trial court's judgment.

*Affirmed.*