COURT OF APPEALS OF VIRGINIA

Present:  Judges Alston, McCullough and Senior Judge Clements
Argued at Richmond, Virginia

DREW JOSEPH HARRISON

MEMORANDUM OPINION[*] BY
v.      Record No. 1244-14-2       JUDGE STEPHEN R. McCULLOUGH
OCTOBER 13, 2015

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

Craig S. Cooley (Jennifer M. Newman, on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Drew Joseph Harrison challenges his convictions for object sexual penetration and

forcible sodomy.  He argues that the evidence at trial failed to prove that his actions were against

the will of the complaining witness by force, threat or intimidation.  He also contends that he was

denied due process when the Commonwealth reneged on its representations that it would not

prosecute these cases.  We find no error and affirm.

BACKGROUND

I.  THE TRIAL EVIDENCE

J.R. and appellant have known each other since the fourth grade.  They were in school

together through high school.  In high school, the two dated for several months.  They attempted

sexual intercourse once during that time.  They maintained an "off and on" friendship after high

school.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

They eventually reconnected through Facebook. J.R. came to the conclusion that appellant was distressed because he talked about wanting to kill himself and he had mentioned having a drug habit. He asked her to help him overcome his drug habit. She invited him to dinner on occasion, where he would join her and some of her friends. J.R. thought these friends would be "good influences." At the time, J.R. was involved in a romantic relationship with another person and appellant knew about this relationship.

Both J.R. and appellant were interested in writing erotic stories, and they shared such stories with each other. In one of the stories, set in the Middle Ages, the heroine, a young girl, steals a horse and is sold into sexual slavery. J.R. knew that appellant was romantically interested in her. She considered conversations with appellant about his interest in her "awkward." While she found his romantic interest "flattering" because he is an "attractive gentleman," she told appellant that she was with somebody else. She testified that "when I'm with someone, I'm with somebody." She said she may have talked with appellant about her boyfriend's sexual interest in her. She also sent appellant a comment that she was a "BDSM sub"[1] and she acknowledged talking about that with appellant, although "[n]ot in super great detail." "Sub" means "submissive."

J.R. did some modeling "on the side." She shared some of her modeling photographs with appellant via text message. She explained that she wanted feedback from her friends about the photos and that she wanted him to feel "included in [her] inner circle and . . . to be part of the things [she] was doing." At one point he became upset and told her she was "leading him on" with the photos. They argued, and she said she would not show him any more photos. She testified that "[y]ou would see the same amount [of clothing on her] as a girl on the beach" in the

---

[1] "BDSM" is an acronym that is generally understood to stand for Bondage, Domination and Sadism and Masochism.

photos she sent him. She acknowledged posing for nude photographs but said she did not send him those photographs. According to J.R., nude or partially nude photographs of her were available to members of a certain modeling website, and were publicly available on photographers' websites.

Sometime between the end of February and early March 2012, J.R. met with appellant at a bookstore. They talked. He did not seem happy. She invited him to come to her apartment. She mentioned that she was in the process of packing up her apartment for an upcoming move, but that they could "watch a movie or hang out."

When they arrived at her apartment, she put on a program for them to watch and placed a blanket on the floor. For a time, they were both lying down on the blanket. After a while, appellant started "rubbing on" or massaging her "for a few seconds" on her feet and shoulders. J.R. testified that while she did not want to encourage anything, she has friends who are male and "[t]hem touching [her] doesn't make [her] uncomfortable." She got up and started moving around. He followed her down the hallway leading to her bedroom.

As she was walking down the hallway, he pushed her toward the wall, kissed her, and pushed back on her shoulders. She firmly said "no" and "I don't really want to do this." In response, he told her that he liked her. She replied, "Look, just go hang out. I'm going to go pack."

Appellant followed her into the bedroom. He pushed her on the bed and removed her clothing. Her bra was torn. She pushed him, but not too hard out of fear of making him angry. She said "stop" and "no." She also mentioned her boyfriend and said this was not something she wanted. At first, appellant began by sucking on her toes and thighs and kissing her stomach and hips. He then repeatedly performed oral sex and penetrated her vaginal area with his fingers. J.R. attempted to push him away with her feet, although not forcefully, and telling him this was

- 3 -

not something that she was interested in doing. She also tried to scoot and roll away and to pull up her pants but she could not because he was pinning down her wrists, torso, and ankles. When he kissed her, she bit his lip. She also punched him "a couple times" although not very hard. She explained that she "was taught that when you're attacked, you don't forcefully hit [the attacker] if you don't think you can really get away." Once he relaxed his hold on her, she was able to scoot off of the bed and stand up. Appellant sat there briefly and said he was sorry. She told him that "he needed to leave right now." Appellant left.

J.R. texted a friend after appellant left. When the friend met J.R. a few hours later, he could tell that she was "very upset." Soon after, J.R. sought post-sexual-assault counseling at the YWCA. J.R. decided she needed closure. To that end she met with appellant at a bookstore several weeks after the incident. At her request, a friend drove J.R. there and he stayed nearby. J.R. told appellant that she had not wanted to instigate anything with him and that what occurred was not what she wanted to happen. Appellant said he thought she wanted those things to happen. He apologized.

They also exchanged text messages after the incident. Appellant texted her, "I honestly thought you wanted me to do that, then I wasn't sure." She responded, "What part of please stop and hitting you made you think that I wanted that?" He answered, "I guess when you told me about some of your fantasies, I wasn't sure if you fighting me was playful or not. I really didn't know, so I stopped." In response, J.R. texted, "I told you I didn't want it. I told you I'm with [a boyfriend] and that's it. I told you to leave and to stop and I was serious. I punched you. You destroyed a brand new bra that I got for my birthday." In an exchange over Facebook, appellant told J.R., "I honestly thought you wanted me to rape you." She answered, "No." He also sent her what she perceived as a threatening message, something to the effect that "I'd love the

thought of bearing witness to your corpse." J.R. did not contact the police about either the sexual assault or the threatening message.

On cross-examination, the defense pointed to the answers J.R. had provided as part of a web-based dating profile. She stated that she was attracted to dangerous situations, that she enjoyed rough or gentle sex equally, and that she liked biting. J.R. admitted as much at trial, with the important qualifier that situations must be truly consensual.

The prosecution also adduced evidence from a Benjamin Gray, who knew both appellant and J.R. from high school. He previously dated J.R. Through Facebook, appellant sent Gray a message that stated in relevant part "Hey Ben, did [J.R.] ever tell you about the time I pinned her down and ate her bloody vagina? She was all like, no. Please stop. Please." Appellant later deleted the Facebook profile that he sent the messages from, leaving them without a sender record, but Gray testified that appellant was the sender of record when he received the messages.

The police became involved when appellant's therapist became concerned about appellant, after he expressed homicidal fantasies about harming J.R. and killing her. Appellant sent her messages along those lines. Appellant confirmed to the police that he had sent such messages to her. Appellant also told the police that he went online to look up J.R.'s photographs and that it made him even angrier at her, but that he could not stop doing it. Appellant further told the police that he did not, in fact, have a drug problem at any point and that he told J.R. he did as a pretext to spend more time with her. At trial, he acknowledged knowing that J.R. was "notoriously anti-drug whether it's prescription or otherwise," and he "thought that could be a way for [himself and J.R.] to get closer together."

Appellant's therapist, Dr. David Dameron, diagnosed appellant with "an autistic spectrum disorder known as Asperger[']s." He explained that "Asperger[']s is a disorder that makes it difficult, sometimes impossible for [appellant] to read body language, to read

expressions, to understand certain abstract concepts." Dameron said that appellant would miss social cues and experience "tremendous anxiety in social situations."

Dameron also spoke with J.R. She relayed to him that appellant had tried to sexually assault her. He inquired why she did not call the police. According to Dameron's notes, she answered that "when I asked [him] to stop, he stopped." Dameron also testified that J.R. stated that she only asked appellant "to stop once and he stopped."

Appellant testified in his own defense. He told J.R. that he "was interested in her, that [he] liked her" and, further, that he expressed a "sexual interest in her." He said that "she started sharing sexual fantasies with [him] as well as details of her own sexual life." He said she told him about "being a BDSM, being a submissive." She also showed him some stories she had written, including one about being a sex slave in medieval times. According to him, she complained to him about her current boyfriend, and, specifically, his lack of sexual drive and "that he wasn't satisfying her."

In the days before he met her at the bookstore, appellant testified that the main topic of conversation was sex and her sexual partners. When they met at a bookstore and talked some, she invited him to her apartment. Appellant said, contrary to J.R.'s testimony, that she did not mention anything about packing.

Once at her apartment, he testified, she showed him nude modeling photos—a fact J.R. denied.[2] When he started to rub her hair, back, arms, and, according to him, feet, he said she was compliant and did not tell him to stop. He stated that when he first tried to kiss her in the hall, she turned to the side and moved her lips away, but that she would let him kiss her cheeks, forehead, and neck. He denied that when she went into the bedroom that she stated that she was

_____

[2] A police report contains a notation that on the night in question, J.R. had shown appellant "modeling photos with the intent of getting his feedback." The report does not disclose whether those photos depicted J.R. nude or partially nude.

going in there to pack. He stated that he gently pulled her down onto the bed but she did not fight or struggle. She said "no, no, no," but according to him she did so "with a smile and a smirk on her face." According to appellant's account, J.R. was being "playful." He said she helped him take her clothes off and there was no struggle and no use of force. He also testified that if someone says, "Stop" or "I don't want to do this," that is a clear signal that he can understand. But, he testified, she "didn't do that at all." He said she "would throw these very gentle punches about my arms" which he considered playful. According to him, when she said stop, he stopped. He acknowledged performing oral sex and trying to stimulate her with his fingers. He testified that he thought it was with her consent.

When asked about his Facebook message to Gray, appellant stated that J.R. actually broke up with him for Gray when they were in high school, and he harbored resentment toward Gray because of that fact. He said it "was just vulgarity" that was meant to be "inflammatory," and "get a rise out of" Gray.

At the conclusion of the evidence and argument, the trial court noted that the sole contested issue was whether the sexual contact was consensual. The court provided a detailed explanation for why it believed the victim's account was more credible than appellant's. The court found appellant guilty.

## II. POST-TRIAL DUE PROCESS MOTION

Counsel filed a post-trial motion to set aside the verdict, alleging a violation of his due process rights. The gravamen of his claim was that the prosecutor assigned to the case, Susanne Bielaski, agreed to *nolle prosequi* or dismiss the charges if the defendant received treatment. In reliance on these representations, the family decided to forego retrieving recently deleted electronic communications from the complainant to the defendant. These communications, the defense argued, "demonstrated the consensual nature of the encounter she now claims to have

been unconsented to." Months later, when the prosecution announced its change in position, it was too late to retrieve the data. He also argued the evidence was insufficient for conviction.

In its opposition to the motion, the Commonwealth contested the factual assertions made by the defense, asserting that

> the Attorney for the Commonwealth indicated at that time that she was hopeful that the Defendant engaging in such treatment would place the parties in a posture at a later date to resolve the case without trial, not that it would be dismissed or *nolle prosequi*. No such promise would have <u>ever</u> been made by this Attorney for the Commonwealth without being able to consult with the complainant first.

The Commonwealth also asserted that it did nothing to prevent the defendant from obtaining evidence for trial and that it was not even aware of electronic evidence.

A hearing on the motion revealed the following. Appellant's family retained William Dinkin to represent appellant. When appellant described to him that there were significant communications between himself and the complainant, Dinkin thought some of those items would be useful to the defense. He recommended to appellant's family to promptly send the telephone and computer to a computer forensics company. He explained that time was of the essence to avoid loss of the data. The analysis would cost between $4,000 to $5,000.

Richmond A. Wollstein, an attorney who represented appellant at his bond hearing, testified that the prosecutor assigned to the case was instrumental in obtaining a pre-trial bond for appellant. She commented to him that appellant needed treatment, not jail. When appellant was accepted into a treatment program in California, Bielaski assisted counsel in obtaining a bond so appellant could travel out of state and attend the program. Wollstein recalled that Bielaski answered in the affirmative when he asked Bielaski whether she would be prepared to either dismiss or *nolle prosequi* the charges upon appellant's completion of the treatment program. Wollstein testified that appellant's parents were in the room when she made those

statements. Wollstein felt confident advising appellant's parents to pay for the treatment because he believed there was an agreement. He expected that upon completion of the program, the charges would be *nolle prosequied* or dismissed. He stated that there was no question in his mind about the existence of an agreement to *nolle prosequi* or dismiss the felonies provided that appellant completed treatment. His understanding was that that would take care of the felonies but that a misdemeanor charge might involve some punishment. Nothing, however, was reduced to writing. Wollstein acknowledged that he held Bielaski in "the highest regard in terms of upholding agreements." He also noted that dismissing three felony counts of this gravity was "an extremely generous offer."

Wollstein also explained that "[t]here was a possibility that [appellant's family] could spend a good sum of money having computer systems analyzed to see if there was information that might be of assistance to Mr. Harrison." This analysis would cost approximately $5,000. However, based on his belief that there was an agreement, Wollstein did not think that further trial preparations were necessary. He did not raise the question of having electronic devices analyzed with the prosecution. After the Commonwealth announced its intention to proceed to trial, a computer forensics company examined appellant's telephone and the computer but no data could be retrieved.

Appellant's father's and mother's recollection was substantially the same as Wollstein's. Appellant's father testified that Bielaski stated that she was not sure a crime had been committed, other than a misdemeanor, and that J.R. did not want to see appellant go to prison. His mother offered similar testimony. She remembers that Bielaski mentioned the words "nol pros." Appellant's mother and father were certain that an agreement had been struck and that the charges would be dropped if he successfully completed the treatment program. Based on their understanding of the agreement, appellant's parents decided to forego any forensic analysis of

the phone or computer, opting instead to pay for their son's expensive treatments – for a total cost of $50,000.

Bielaski recalled conveying J.R.'s sentiment that appellant needed treatment and that she did not want him to go to jail, or words to that effect. Bielaski was confident, however, that she did not say that she would *nolle prosequi* the felony charges. She explained that her practice in sexual crime cases is to consult with the victim first.

The trial court denied the motion, noting that the evidence was in conflict and that this was a classic case of "parties hearing what they want to hear." The court also noted the absence of any contemporaneous writing of what transpired. In the alternative, the court held that the evidence did not establish "that any electronic communications were rendered irretrievable in the interval of time between the period when the defense believed it had an agreement and the time it learned that it did not . . . ." Finally, the court concluded that there was no conduct of the Commonwealth that led to any loss of evidence. The Commonwealth was not involved in the decision to collect, secure, and maintain data on the devices. The court found that "the defense . . . simply made their own decisions and can't lay them at the Commonwealth's door."

The court ultimately imposed a total sentence of 50 years, with 47 of those years suspended.

ANALYSIS

I. APPLYING THE STANDARD OF REVIEW, THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THE APPELLANT'S GUILT.

The standard by which we review the sufficiency of the evidence on appeal is a rigorous one, and it is often outcome determinative. On appeal, we examine trial court factfinding "with the highest degree of appellate deference." Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006). We neither "reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), nor "preside *de novo* over a second trial" on appeal,

Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004). Furthermore, credibility determinations are within the fact finder's exclusive purview. Zirkle v. Commonwealth, 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949). "[T]he relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "This deferential standard of review applies not only to the historical facts themselves, but the inferences from those facts as well. Thus, a factfinder may draw reasonable inferences from basic facts to ultimate facts, unless doing so would push into the realm of *non sequitur*." McEachern v. Commonwealth, 52 Va. App. 679, 684 n.2, 667 S.E.2d 343, 345 n.2 (2008) (citations and internal quotation marks omitted).

A conviction for forcible sodomy under Code § 18.2-67.1(A)(2) requires the Commonwealth to prove that the act was done against that victim's will by means of force, threat or intimidation. The same requirement exists for a conviction under the statute prohibiting animate object sexual penetration, Code § 18.2-67.2(A)(2).

The evidence, particularly when viewed in the light most favorable to the prevailing party, supports the trial court's conclusion that appellant acted against the will of the victim. First is the victim's testimony. She testified that she rejected his attempts to kiss her in the hall. When he threw her on the bed, she resisted, trying to push him away, repeatedly saying "no," stating that she had a boyfriend, that she did not want this, biting his lip, and repeatedly punching him. Her language and her behavior all signaled that appellant was forcing himself upon her against her will. Immediately after the incident, she called a friend who described her as "very upset." She promptly sought counseling for sexual assault from the YWCA. Her text messages

- 11 -

shortly after the fact also support her trial testimony. In these texts, she made plain that appellant acted against her will.

Appellant offered a different account. Where the victim depicted a physical struggle, appellant stated that "[t]here was no struggle," and testified that J.R. helped him undress her. The trial court resolved those credibility determinations against appellant. The text messages mention a torn bra, which appellant did not dispute at the time. A torn bra is not consistent with compliance by the victim in helping appellant remove her clothing. Appellant's own message to a high school acquaintance, in which he stated that he "pinned [J.R.] down" and "She was all like, no. Please stop. Please," corroborate the victim's account that this was not a consensual situation. Appellant tried to explain this message away, but the trial court was not required to accept this self-serving explanation.

Appellant's Asperger's may impede his ability to read subtle social cues, but according to both his therapist and appellant, clear communicative signals were not a problem. Dr. Dameron stated that clear communication required being "very concrete" with appellant. Appellant testified, "[I]f someone says to me, [']What are you doing? Stop. I don't want to do this. Stop.['] That's clear. I can clearly understand that." He contended that J.R. did not do that, but her testimony proved otherwise. She testified that she said "stop" and "no." She mentioned her boyfriend, and told appellant that she did not want this and that this was not the purpose for which she invited him over.

It is true that the victim did not contact the police after the incident. This is readily explained by their longstanding friendship spanning back to the fourth grade, her sympathy with his mental health problems, and, at least initially, her preference that he obtain treatment and stay away from her rather than face punishment in the criminal justice system.

The victim's actions of sending appellant photographs of herself, discussing sexual matters, sharing erotic stories, and inviting him alone to her apartment when she knew he was romantically interested in her certainly proved in hindsight to have been imprudent, particularly when combined with his knowledge of her interest in being a "sub." These actions, however, hardly constituted an invitation for appellant to force himself onto her when she told him both by her words and physical resistance that she did not want him to do what he was doing to her.

Appellant also points to Dr. Dameron's testimony that J.R. told him that she only asked him to stop once and he stopped. First, the trial court heard the totality of the evidence to assess the strength of Dr. Dameron's recollection on that point. Such credibility determinations, when they find support in the evidence, are not to be second-guessed on appeal. In addition, Dr. Dameron's testimony was mixed at best, because he also noted that J.R. told him that appellant had tried to sexually assault her—not that they had engaged in a consensual encounter.

Applying, as we must, the demanding standard of review that governs challenges to the sufficiency of the evidence, we conclude that the evidence supports the judgment of the trial court.

II. THE RECORD DOES NOT SUPPORT THE CLAIM OF A DUE PROCESS VIOLATION.

The defense presented evidence that there was an agreement to dismiss or *nolle prosequi* the felony charges against appellant, provided that he successfully completed a therapy program. The prosecution contested the existence of such an agreement. The trial court found, among other things, that appellant had not carried his burden of proving the existence of such an agreement.

As the party alleging a breach of a plea agreement, appellant bore the burden of showing by a preponderance of the evidence that a breach occurred. See United States v. Snow, 234 F.3d 187, 189 (4th Cir. 2000). We review the trial court's findings regarding "'what the parties said

or did'" with the same deferential standard as for all other factual findings. United States v. Martin, 25 F.3d 211, 217 (4th Cir. 1994) (quoting L.K. Comstock & Co. v. United Eng'rs & Constructors, 880 F.2d 219, 221 (9th Cir. 1989)).

Mr. Wollstein, a very experienced and highly regarded attorney, testified to the existence of an agreement. His testimony was corroborated by the testimony of appellant's parents. The prosecutor, while acknowledging that she supported therapy for appellant and supported his bond motion, testified that she was confident that she did not promise to *nolle prosequi* the case, because she had not consulted the victim and she always does so in sex crime cases. Wollstein, to his credit, acknowledged that he held Bielaski "in the highest regard" including "in terms of upholding agreements." Unfortunately, there is nothing in writing either initially or in later correspondence that supports either version.

The trial court saw and heard the testimony. The appellant bore the burden of proving the existence of an agreement. The trial court made a factual finding that he did not prove the existence of an agreement, noting the conflict in testimony, the absence of corroborating contemporaneous written confirmation, and the natural tendency of parties to "hear[] what they want to hear." We cannot say on this record that the trial court's conclusion is plainly wrong or without evidence to support it. Consequently, we must affirm the trial court's decision.[3]

### CONCLUSION

We affirm the judgment of the trial court.

Affirmed.

---

[3] Based on our disposition, we do not reach the trial court's alternate grounds for denying the motion, namely, that appellant failed to prove that any exculpatory evidence was actually lost and, in addition, that the prosecutor was not even aware of the existence of electronic devices that might need forensic testing and, therefore, the defense must accept the consequence of its choice to delay the analysis of these devices.