COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Humphreys and Friedman
Argued at Lexington, Virginia

ROGER DWAYNE KIMBLE, JR.

                                   MEMORANDUM OPINION[*] BY

v.       Record No. 0831-21-3       CHIEF JUDGE MARLA GRAFF DECKER
                                    AUGUST 2, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Anne F. Reed, Judge

Jennifer T. Stanton, Senior Assistant Public Defender (Kieran
Bartley, Assistant Public Defender, on brief), for appellant.

Rebecca M. Garcia, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Roger Dwayne Kimble, Jr., appeals his convictions for sodomy, in violation of Code

§ 18.2-67.1(A)(2), and object sexual penetration by force, in violation of Code § 18.2-67.2(A)(2).[1]

He argues that the evidence was insufficient to sustain his convictions because the victim's

testimony was inherently incredible.  For the following reasons, we affirm.

## I.  BACKGROUND[2]

On November 15, 2019, the appellant texted Sophia Miller shortly after 5:00 p.m.  He

asked if she was home and told her that he had cigarettes.  He then arrived at Miller's Craigsville

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The trial court also convicted the appellant of attempted felony escape.  He does not
challenge that conviction on appeal.

[2] "In accordance with familiar principles of appellate review," the Court views the facts
and the reasonable inferences flowing from them "in the light most favorable to the
Commonwealth, the prevailing party at trial."  *Poole v. Commonwealth*, 73 Va. App. 357, 360
(2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)); *see Gerald*, 295 Va. at 473.

home a short time later with food and cigarettes, in order to have dinner with her while her boyfriend was at work. The appellant and Miller had been coworkers. He also had babysat for her children. He and Miller had previously had "sexual relations," and he occasionally slept at her home. She also described him as her best friend. When the appellant arrived that day, he was angry and told Miller that she did not "treat him fairly" because she gave other men "a chance" at a romantic relationship with her but would not become romantically involved with him. Miller told the appellant that she was not interested in a relationship with him. He started to "storm out" but then began cooking dinner "like nothing happened." He gave Miller a plate of food and a steak knife with which to cut it.

After the meal, the appellant went to the bathroom and then returned to the living room with his pants unbuttoned and unzipped. The appellant ignored Miller's request to fasten his pants and instead exposed his penis. He demanded that Miller "suck it," but she refused. The appellant then tried to remove her pants. She fought him and cried for him to stop, but he pulled her pants down to "about midway between [her] knees and waist." He then wrestled Miller from the couch to the floor and told her that he "would stick his penis in whatever hole that he could." After Miller fought her way back onto the couch, the appellant slapped her in the face and choked her. He also penetrated her vagina with his finger and demanded oral sex. When she resisted, he threatened to kill her and looked at the steak knife she had used during dinner. Miller was afraid that the appellant would hurt or kill her. The appellant put his penis in Miller's mouth "a couple times" before backing away and pulling up his pants.

Miller was in shock after the altercation but sent a text message to her boyfriend to hurry home and ran to her bedroom. The appellant told Miller that he was "just kidding" and that he "heard [she] liked it rough so [he] figured [she would] like it." Miller phoned her friend Brandon Davis and told him that she was not "okay." She was on the phone with Davis when the

appellant entered her bedroom. She demanded that he leave. He ignored her, put on rubber gloves, and told Miller that he was "dispos[ing] of the evidence." He then repeated that he was "just kidding." Miller screamed several times for the appellant to leave. As he went to the door he asked, "[D]oes this mean I can't come back later and stay?" Miller told him that he could not come back and yelled at him to "get the fuck out." She thought she screamed loudly enough to be heard by her neighbors.

Miller remained on the phone with Davis until after the appellant left. She ended that call when her boyfriend, Billy Ryder, phoned her in response to her text. Ryder described Miller as "hysterical" as she told him what the appellant had done. Ryder called 911.

At some point while Ryder and Miller were on the phone, before Ryder arrived at Miller's home, the appellant tried to phone her. At Ryder's suggestion, Miller returned the appellant's call while Ryder was also on the phone. During that call, Miller asked the appellant why he tried to rape her. He replied, "I thought you like it like that, don't you?" When he later tried to contact her, she messaged him that "what he did wasn't right." She also blocked his phone number.

Miller spoke with a police investigator on the phone the night of the incident, as soon as Ryder reached her residence. She also went to the Sheriff's office that same night and spoke with an investigator.

Three days after the attack, Miller confronted the appellant in a text message. Her message recounted that he choked her, put his penis in her mouth, and "tried to rape" her. Miller texted that his actions were "sick," "twisted," and "[not] okay." The appellant replied, "I never did anything with you that we hadn't been doing all day since [your boyfriend] left for work."

As a result of Miller's police report, Sergeant David Browning of the Augusta County Sheriff's Office ultimately conducted a Sexual Assault Response Team (SART) interview with

- 3 -

her. He also attempted to contact the appellant. The SART interview with Miller was originally scheduled for November 25, 2019, but did not occur because Miller forgot about it. Miller testified at trial that she did not recall missing the interview but that she had "vehicle problems" and was moving at the time. Sergeant Browning rescheduled the interview for December 18, 2019. During the interview on that date, Miller told Browning that she did not get a protective order because she did not have enough gas to get to the courthouse. At trial, she testified that she did not get a protective order because the appellant did not know where she was living and she was not afraid of him.

The appellant refused to speak to officers prior to his arrest. After his arrest, he told Sergeant Browning that he and Miller had a "strange relationship." The appellant said that he and Miller wrestled and tickled each other on November 15, 2019. He also said that Miller "like[d] . . . rough [sex]" but he "told her no because [he was] not into that." The appellant stated that he "had to leave out the back door" of Miller's residence that evening because her boyfriend "came home early." Sergeant Browning obtained a search warrant for the appellant's phone and discovered that all text messages and call data prior to November 30, 2019, had been deleted, although the phone still contained photographs taken prior to that date. Browning then obtained the appellant's cell phone data from Verizon. That data, as well as the data from Miller's cell phone, indicated that the appellant both made and received calls and text messages on the night of November 15, 2019. Those records showed that the appellant and Miller exchanged text messages or phone calls between about 5:00 and 5:30 p.m., shortly after 7:30 p.m., and again shortly after 9:00 p.m. that night. The records also showed that all cell phone activity occurred through cell towers in Craigsville.

Miller's neighbor, Patricia Berry, testified for the defense. She lived approximately thirty feet away from Miller's residence and did not hear any screaming on November 15, 2019.

Berry, however, could not specifically recall whether she had been at home that evening and could say only that she was usually home on Friday nights.

The appellant presented an alibi that he had been at a friend's hunting camp outside Craigsville on November 15, 2019. Miles Haislett testified that he was with the appellant on November 15, 2019, which was a Friday, noting that it was the last day of a particular type of hunting season. He also testified, however, that the events he described had occurred on a Saturday. According to Haislett, the appellant arrived at his residence in the middle of the afternoon, but he also testified that the appellant could have arrived there in the morning. Haislett said that at around 6:00 or 7:00 p.m., he and the appellant left for Michael Morris's hunting camp, which was twenty-five or thirty miles outside Craigsville. They planned to stay overnight but left around midnight because it was cold and rainy and Morris's trailer leaked. Haislett did not see the appellant make any telephone calls while they were together.

Morris also testified, stating that he was with the appellant on November 14 or 15, 2019, which was a Friday and the day before "rifle season" started. He said that they drove to his camp outside Craigsville shortly after noon to set up for that evening's dinner. He then dropped the appellant off at a supermarket back in Craigsville at about 5:00 p.m. Morris testified that the appellant returned to the camp later that night, around 9:00 p.m., with Haislett but that the two men left when it began raining. Morris said that Verizon cell phone service was not available at his camp or on most of the drive to and from the camp. He admitted on cross-examination that when he originally spoke to Sergeant Browning about taking the appellant to his hunting camp that day, he did not mention that he brought the appellant back to Craigsville around 5:00 p.m. or that the appellant returned to the hunting camp later that evening with Haislett.

The appellant testified in his defense. He said that he was at Miller's residence in the morning on November 15, 2019, and left around noon. He claimed that he was confused when

talking to Sergeant Browning because "the days all run together." He further asserted that the incident in which he had reported leaving through the back door of Miller's home had occurred about a week before November 15, 2019. The appellant denied ever hurting Miller or trying to have sex with her on November 15, 2019, but he said that they had had consensual sex in the past and engaged in a "little fling" while she was dating Ryder. The appellant also admitted communicating with Miller by phone around 6:00 p.m. on November 15, 2019, before he left for the hunting camp.

In closing argument, the appellant contended that Miller's testimony was inconsistent and incredible. The trial court noted that the case turned on the credibility of the witnesses. It found the phone records and testimony of Haislett and Morris "compelling." The court recognized that Haislett testified that the appellant did not use his phone while they were together and Morris testified that there was no cell phone service in the area of the hunting camp. The court observed, however, that the phone records showed calls between the appellant and Miller during the time period he claimed to have been at the hunting camp. The court concluded that Miller's testimony was credible and was corroborated by the phone records. Accordingly, it found the appellant guilty of sodomy and object sexual penetration by force.

## II. ANALYSIS

The appellant argues that the evidence was insufficient to sustain his convictions because Miller's testimony was inherently incredible and unworthy of belief. He asserts that no physical evidence proved the crime, Miller's testimony was contradictory, and her actions were contrary to "usual human behavior."

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original)

(quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when [the appellate court concludes] that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Accordingly, "[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). Instead, such inconsistencies are appropriately weighed and "'resolved by the fact finder,' not the appellate court." *Id.* (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). In making a credibility determination, the fact finder "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (*en banc*); *see Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991).

With regard to the crimes at issue here, both of a sexual nature, it is well established that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)). "[B]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the

victim, a requirement of corroboration would result in most sex offenses going unpunished." *Id.* at 368-69 (quoting *Wilson*, 46 Va. App. at 88).

Here, as the trial court stated, the resolution of the case hinged on witness credibility. And the law is clear that "[t]he credibility of the witnesses and the weight accorded the evidence are matters *solely for the factfinder*." *Commonwealth v. Perkins*, 295 Va. 323, 328 (2018) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009) (emphasis added)). Only if the witness's testimony is inherently incredible as a matter of law will the appellate court disturb the trial court's credibility determination. *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 70-71 (1999)); *see also Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010) (noting that the same deference that applies to the findings of fact made by a jury also applies to findings made by a trial judge). As already noted, the "inherent incredibility" test is a tremendously high standard on appeal.

Contrary to the appellant's suggestion, the record here does not establish that Miller's testimony was inherently incredible as a matter of law. Relying on *Willis v. Commonwealth*, 218 Va. 560 (1977), the appellant argues that Miller's testimony was inherently incredible because it was inconsistent and she delayed meeting with Sergeant Browning for the SART interview. The appellant's case, however, is readily distinguished from *Willis*.

In *Willis*, a sixty-five-year-old woman alleged that her twenty-two-year-old cousin and another young man raped her, but she did not report the incident until about a month later and then tried to withdraw the warrants. *See id.* at 561-63. Further, the woman gave contradictory testimony regarding details of the alleged offense—which man had raped her first, whether she was wearing any clothing, and whether she had seen and talked to the men after the incident occurred. *Id.* at 562-63. Her reputation in the community for truthfulness was "low." *Id.* at 563. Noting that the woman's "wholly uncorroborated" testimony was "*replete with contradictions*

- 8 -

*and inconsistencies*," the Supreme Court held that her testimony was "incredible as a matter of law." *Id.* at 563-64 (emphasis added).[3]

The appellant claims Miller delayed reporting the incident because she did not attend the SART interview on November 25, 2019, and the interview on December 18, 2019, was thirty-three days after the offenses occurred. The record, however, demonstrates that Miller reported the incident right after it happened. She told Ryder and Davis by phone immediately afterward. Ryder reacted by calling 911 to report the appellant's sexual assault of Miller as soon as she told him about it. Also on the night of the offense, Miller spoke to a police investigator about the assault by phone and went to the Sheriff's office, where she reported what the appellant had done to her. Given Miller's immediate interaction with the police following the incident, the delay in her formal SART interview is not at all comparable to the delay in *Willis,* in which the incident itself went unreported for a month. Further, although Miller missed her first SART interview, she explained that she did not recall scheduling the interview in November and was moving at the time. Her delay in attending the SART interview simply did "not render [her] testimony inherently incredible as a matter of law." *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991) (holding that the explanation given by the juvenile victim for his fourteen-month delay in reporting a sexual assault was "acceptable" under the circumstances of the case). Whether Miller's explanation was credible was for the trial court as the fact finder to determine. *See id.*

---

[3] The Court in *Willis* did not suggest that the *credible* testimony of a victim must be corroborated. *See Wilson*, 46 Va. App. at 88 (quoting *Willis*, 218 Va. at 812, for the principle that "convictions for crimes of a sexual nature may depend upon the 'uncorroborated testimony of a prosecutrix if her evidence is credible[] and the guilt of the accused is believed by the [fact finder] beyond a reasonable doubt'"). The Supreme Court has repeatedly made clear that a conviction for a sexual offense may be sustained by the victim's testimony alone. *See also, e.g.*, *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984); *Snyder v. Commonwealth*, 220 Va. 792, 796 (1980). Here, the trier of fact found the victim credible.

The appellant also contends that Miller's testimony was inconsistent because she provided more details about the offenses at trial than she initially reported to Sergeant Browning and gave different explanations regarding why she had missed the November SART interview and had not obtained a protective order. However, unlike in *Willis*, the descriptions of the offenses that Miller gave at different times were consistent. Also, no evidence suggested that Miller had a poor reputation for truthfulness. That she later provided additional details or other reasons for her actions did not make her an incredible witness. In fact, even assuming that she made inconsistent statements, "[t]he mere fact that a witness may have . . . given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415. Instead, such inconsistencies are "appropriately weighed as part of the entire issue of witness credibility, which is left to the [fact finder] to decide." *Id.*

Additionally, unlike in *Willis*, Miller's testimony was corroborated by the phone records, which the trial court found "compelling." *See Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019) (holding that a witness's testimony was not inherently incredible when it was corroborated by other evidence). The phone records established that Miller called both Ryder and Davis on November 15, 2019, and they testified that she told them about the incident. The phone records further showed that the appellant called Miller after he left her residence and that he, Miller, and Ryder had a three-way phone call.[4] The phone records demonstrated that the appellant made and received phone calls and text messages on the night of November 15, 2019, through a cell site in Craigsville. This evidence legitimately called into question for the trier of fact the testimony of his purported alibi witnesses that he was at a hunting camp a distance away.

_____

[4] During that conversation, Miller asked the appellant why he would rape her, and he replied, "I thought you like it like that, don't you?"

- 10 -

The evidence had this effect because the camp itself had no cell phone service and such service was limited on the route to and from the camp.

Thus, the record in the appellant's case does not show that Miller's testimony was unworthy of belief. *See Snyder v. Commonwealth*, 220 Va. 792, 796 (1980) (stating that the rape victim's story was not "improbable" and the "conflicts in her testimony . . . were not so material or so unusual that her version of the events on the night in question was rendered unbelievable as a matter of law"); *see also Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984) (holding that "[t]he evidence was neither incredible nor so contrary to human experience as to render it unworthy of belief" where, even though the child victim's "credibility was subjected to substantial attack," the trial court believed her).

After balancing all the evidence, the trial court found that Miller's testimony was credible and supported by the phone records. Having reviewed the record, we conclude that Miller's testimony was not inherently incredible and the evidence was sufficient to support the convictions. *See Poole*, 73 Va. App. at 363, 368-69; *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (citing *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). The Commonwealth's evidence proved beyond a reasonable doubt that the appellant was guilty of sodomy and object sexual penetration by force.

### III. CONCLUSION

Miller's testimony was not inherently incredible as a matter of law. Therefore, this Court defers to the trial court's finding that Miller's testimony was credible and sufficient, along with other evidence in the record, to sustain the appellant's convictions. The trial court's judgment is affirmed.

*Affirmed*.